**EXHIBIT 1**

5/19/2022 8:12 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-22-002321
Ruben Tamez

D-1-GN-22-002321

CAUSE NO. _____

| | | |
|---|---|---|
| SHAWN JOSEPH, | § | IN THE DISTRICT COURT |
| *Plaintiff* | § | |
| | § | 201ST, DISTRICT COURT |
| VS. | § | |
| | § | _____ JUDICIAL DISTRICT |
| GENESIS COIN, INC.; GENESIS | § | |
| SERVICES, INC.; AQUARIUS | § | TRAVIS COUNTY, TEXAS |
| MANAGEMENT CORP.; AND EVAN | § | |
| ROSE, | § | |
| *Defendants* | § | |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW SHAWN JOSEPH ("Mr. Joseph"), by and through his undersigned

counsel, complaining of GENESIS COIN, INC. ("Genesis"); GENESIS SERVICES, INC.

("Genesis Services"); AQUARIUS MANAGEMENT CORP. ("Aquarius"); and EVAN ROSE

("Rose") (collectively, "Defendants"), and for cause of action shows unto the Court the

following:

### I.
### DISCOVERY CONTROL PLAN

1.     Mr. Joseph intends that discovery be conducted under Discovery Level 3.  *See*

Tex. R. Civ. P. 190.4.

### II.
### INTRODUCTION

2.     This case arises out of Mr. Joseph's former service as the Chief Intellectual

Property Officer ("CIPO") of Defendant Genesis Coin, Inc.  In 2019, Defendant Evan Rose, the

CEO of Genesis, convinced Mr. Joseph to bring his talent to Genesis by leading Mr. Joseph to

1

Copy from re:SearchTX

believe—through contractual terms, conduct, and verbal statements—that Mr. Joseph's hard work as CIPO would benefit Genesis, in which Rose then granted him a significant equity interest.  In reliance on these arrangements, Mr. Joseph took the significant risk of leaving a secure federal government position to become, and continue as, an officer of a startup.  For more than two years, Mr. Joseph labored to manage, expand, and perfect what Mr. Joseph was led to believe would be Genesis's IP portfolio.  But Rose suddenly and unilaterally decided to deny Genesis its assets by keeping its entire IP portfolio in his own personal name. After the IP portfolio was developed, and after Genesis's sales substantially increased, Rose demanded to "redeem" Mr. Joseph's shares at the original price at which they were issued over two years prior. Rose, after having pre-filled his desired price/share, sent Mr. Joseph an agreement wherein Mr. Joseph would agree to "choose" to sell his shares for that price along with a full release of all claims against Genesis, Rose, Aquarius, and other affiliates. When Mr. Joseph challenged the price and requested relevant documents to determine a fair price, Rose retaliated against Mr. Joseph by terminating him, despite being overall "pleased" with Mr. Joseph's performance. When Mr. Joseph challenged this corporate mismanagement, Rose again retaliated against Mr. Joseph by purporting to have suddenly found new reasons to change the termination to one "for Cause" and "assigned and transferred" Mr. Joseph's shares back to the Company for nothing in exchange.  Mr. Joseph brings this action to recover the damage caused to him by Genesis's breach of contract and Rose's misrepresentations and retaliation, as well as the unjust enrichment bestowed upon Rose, Genesis, Genesis Services, and/or Aquarius by Mr. Joseph's efforts.

III.
## PARTIES AND SERVICE

3.     Plaintiff Shawn Joseph is an individual residing in Travis County, Texas.

Copy from re:SearchTX

4.      Defendant Genesis Coin, Inc. is a Delaware corporation headquartered in Texas, with its principal office located in Travis County, at 5900 Balcones Drive, Suite 100, Austin, TX 78731.  This Court has personal jurisdiction over Genesis because Genesis maintains its headquarters in Travis County and because Genesis executed a contract with Mr. Joseph, a resident of Travis County.  Genesis may be served with process by personal delivery at its headquarters in Austin.  *See* Tex. R. Civ. P. § 106(a)(1).

5.      On information and belief, Defendant Genesis Services, Inc. is a Delaware corporation that shares its headquarters with Genesis Coin, Inc.  This Court has personal jurisdiction over Genesis Services because, on information and belief, Genesis Services maintains its headquarters in Travis County.  Genesis Services may be served with process by personal delivery at Genesis's headquarters in Austin.  *See* Tex. R. Civ. P. § 106(a)(1).

6.      Defendant Aquarius Management Corporation is a Puerto Rican technology consulting firm that, on information and belief, manages and/or executes Genesis's transactions and shares/uses the intellectual property created for Genesis, with its headquarters located at 802 Fernández Juncos Avenue, San Juan, Puerto Rico 00907.  This Court has personal jurisdiction over Aquarius because Aquarius has sufficient relevant contacts with Travis County, including, on information and belief, entering into relevant contracts or other business transactions with Genesis, Genesis Services, and/or Rose.  Aquarius may be served with process by registered or certified mail.  *See* Tex. R. Civ. P. § 106(a)(2).

7.      Defendant Evan Rose is an individual residing in San Juan, Puerto Rico.  This Court has personal jurisdiction over Rose because Rose has sufficient relevant contacts with Travis County, including the hiring of Mr. Joseph, a resident of Travis County.  Rose may be served with process by registered or certified mail.  *See* Tex. R. Civ. P. § 106(a)(2).  Rose

Copy from re:SearchTX

founded both Genesis and Aquarius and acts as the CEO of Genesis and President & CEO of Aquarius.  On information and belief, Rose also founded and manages Genesis Services.

IV.
JURISDICTION

8.      Pursuant to Tex. R. Civ. P. 47, Mr. Joseph seeks monetary and non-monetary relief within the jurisdictional limits of this Court.

V.
VENUE

9.      Pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a)(1), venue is proper in Travis County because all or a substantial part of the events or omissions giving rise to the claims occurred in Travis County.

10.     Pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a)(3), venue is also proper in Travis County because Defendant Genesis maintains its headquarters at 5900 Balcones Drive, Suite 100, Austin, TX 78731, located in Travis County.

11.     Pursuant to Tex. Civ. Prac. & Rem. Code § 15.005, venue is also proper in Travis County because Mr. Joseph has established proper venue against Genesis, granting the Court venue of claims against all other Defendants arising out of the same transaction, occurrence, or series of occurrences.

VI.
FACTS

**A.      Background**

12.     Cryptocurrency is regarded by many as the investment of the future.  Just last year, Matt Damon was featured in a commercial aired during the Super Bowl, in which he encouraged viewers to invest in cryptocurrency by claiming "fortune favors the brave."[1]  Like

---

[1] https://www.youtube.com/watch?v=9hBC5TVdYT8

4

Copy from re:SearchTX

any asset, the value of cryptocurrency stems from the ability to trade it for liquid cash.  Enter Defendant Genesis Coin, Inc., which is in the business of providing the public with "Bitcoin ATMs"—machines or kiosks similar to bank ATMs but designed to trade Bitcoin for real currency and vice-versa.  Genesis was founded by its CEO, Defendant Evan Rose, who later appointed Mr. Joseph as Genesis's Chief Intellectual Property Officer.  In that role, Mr. Joseph worked tirelessly for years developing patents and other types of IP rights relating to these Bitcoin ATMs for Genesis.  This case arises because Rose has denied Genesis the intellectual property assets that Mr. Joseph developed for Genesis's benefit, breached Mr. Joseph's Employment Agreement, and cut Mr. Joseph out of his fair share of the value.

13.     Mr. Joseph was born in the United States after his parents immigrated from Kerala, South India.  The Joseph family is devoutly Catholic and speaks the language Malayalam.  Like many immigrants, Mr. Joseph's parents pushed him to achieve high academic excellence, which he did.  After graduating from an honors high school for gifted students, he studied biochemistry at the University of Florida, took additional classes in computer science, worked a first job as a researcher in a hematology-oncology/cancer research lab at the university, and further completed most classes of a Master's degree program in pharmaceutical chemistry with a 4.0 GPA.  Mr. Joseph went on to apply his technical prowess to become a primary patent examiner for the United States Patent and Trademark Office in computer science-related arts.  Mr. Joseph moved to Austin in 2015, and it was there he crossed paths with Defendant Evan Rose.

14.     Rose is an early-thirty-year-old American multi-millionaire CEO and college drop-out, who moved himself and his businesses to Austin around 2015-2016.  On information and belief, based on Rose's own public statements, he did so to pay less in taxes.

Copy from re:SearchTX

15.     Attached hereto as <u>Exhibit A</u> is a "Persona" written by The Bitcoin Reserve Journal, for which Rose gave a lengthy interview.[2]  As Rose explains, in 2012, he lived in San Diego, California and found pleasure in "evangelizing Bitcoin to whomever would lend a 22-year-old their ear."

16.     However, Rose admits that he was given the idea for a Bitcoin ATM by a "gregarious fellow" he happened to meet, who had developed a prototype but lacked software skills.  Rose purchased the rights to the domain name "bitcoinATM.com" from this man, and the prototype Bitcoin ATM was included for free.  *See* Exhibit A.

17.     Rose then unveiled his first commercial Bitcoin ATM in San Diego in May of 2013.  *See* Exhibit A.  According to Rose, his main objective was "basically allowing people to buy Bitcoins with cash, [or] cash Bitcoins out right on the spot."[3]

18.     On May 10, 2013, Rose incorporated Genesis Coin, Inc. in Delaware as the company through which to operate his Bitcoin ATM business.

**B.     Hiring of Mr. Joseph**

19.     Sometime in 2015-2016, Rose moved to Austin, Texas, where he would later open Genesis's principal United States office at 5900 Balcones Drive, Suite 100.  Rose's Persona also states that he "met some very dear friends" in Austin.

20.     One such "dear friend[]" was Mr. Joseph, who has lived in Austin since 2015.  Mr. Joseph and Rose met shortly after Rose moved to Austin because they frequented a social co-working space.  Mr. Joseph worked remotely for the United States Patent and Trademark Office as a primary patent examiner at the time, and Rose was attempting to expand his Bitcoin ATM business.  Mr. Joseph and Rose became close friends, traveling to many countries together,

---

[2] https://journal.bitcoinreserve.com/persona-evan-rose/
[3] https://www.youtube.com/watch?v=ZqEdBCKFPAo

Copy from re:SearchTX

and Rose frequently informally consulted Mr. Joseph with technical and business questions throughout.  For instance, Mr. Joseph once advised Rose to adjust a fee Rose was charging for Bitcoin transactions to improve margins and profitability, which Rose did.  In 2019, Mr. Joseph recalls that Rose admitted the value Mr. Joseph had brought in the fee change as earning Rose over $250,000 additional gains already, and wrote Mr. Joseph a check for $125,000.  Mr. Joseph never cashed the check.

21.     According to Rose, "[j]ust days after" moving to Austin, Rose "stumbled upon an article online talking about the situation in Puerto Rico," which made Rose aware of "financial incentives for individuals and businesses to relocate" to Puerto Rico.  "[S]hortly thereafter, [he] was riding a 1-way ticket to San Juan."  Rose further explains of his decision to move to Puerto Rico:  "And isn't it a shame that 10 years of public school Spanish language education had all but circled down the drain?"  *See* Exhibit A.

22.     Relatedly, in 2016, Rose e-mailed Mr. Joseph an "interesting" article titled, "Hate Taxes? Move To Tax-Free Puerto Rico, Stay American, Avoid IRS."

23.     Thus, Rose relocated himself once again, this time leaving Austin, Texas for Puerto Rico.  On information and belief, based on the public statements Rose made about his move and on statements to Mr. Joseph, he did so—again—to pay less in taxes.  Genesis's headquarters remained in Austin. Unbeknownst to Mr. Joseph, Rose incorporated a new business, Aquarius Management Corp., in Puerto Rico on December 1, 2016.  Mr. Joseph was never an employee or officer of Aquarius and was never granted any shares of Aquarius's stock.

24.     As such, on information and belief, for the past several years Rose and at least some of his businesses have been taking advantage of Puerto Rico's Acts 20 and/or 22, which provide significant tax relief to bona fide residents of Puerto Rico.  On information and belief,

7

Copy from re:SearchTX

Rose uses Genesis, Genesis Services, and Aquarius as alter egos of himself for the purpose of certain relevant transactions.

25.      In 2019, Rose offered Mr. Joseph a job at Genesis.  Rose no longer lived in the continental United States and stated to Mr. Joseph that Genesis "needs nexus in Texas."  Mr. Joseph fit the bill because he was (and remains) an Austin resident.  Mr. Joseph was interested in the challenge of helping grow a new company but was wary of the time and energy such a role would demand.  The Employment Agreement, *infra*, assured Mr. Joseph that Mr. Joseph's efforts would ultimately be assigned to, and benefit, Genesis. On other occasions, Rose stated or implied to Mr. Joseph–verbally or by conduct–that Rose would share with Mr. Joseph the value created by Mr. Joseph's work for Genesis.

### C.      Employment Agreement

26.      On November 1, 2019, Mr. Joseph and Genesis executed an Employment Agreement, a true and correct copy of which is attached hereto as <u>Exhibit B</u> (the "Employment Agreement").  The Employment Agreement appointed Mr. Joseph as the Chief Intellectual Property Officer of Genesis.  Mr. Joseph's "Duties" included: "the Employee shall assist ***the Company*** in creating and implementing ***the Company's*** intellectual property strategy, with particular emphasis on analyzing ***the Company's*** existing portfolio of products to determine and execute on intellectual property opportunities."  Exhibit B, § 2 (emphases added).  The term of the Employment Agreement was three years.  Exhibit B, § 3.  It further specifies that Mr. Joseph can be terminated only under certain circumstances.  Exhibit B, § 4.

27.      The Employment Agreement also contains an "Inventions" clause.  Exhibit B, § 9.  Thereunder, Mr. Joseph was required to disclose to Genesis "each Invention involving [Genesis's] business."  Exhibit B, § (9)(a).  Moreover, and critically, Section 9(b) of the

Copy from re:SearchTX

Employment Agreement states:  "The Employee hereby assigns, and agrees to assign, ***to the Company***, or nominee, all of the Employee's rights in and to all Inventions and in and to any and all letters patent or copyrights or applications therefor at any time granted or made . . . upon or with respect to any Invention ***involving the Company's business*** discovered while executing on ***Company's objectives***."  Exhibit B, § 9(b) (emphases added).

28.     The Employment Agreement (designed by Rose), in its entirety, was deceptive and misleading to Mr. Joseph.  Its language, as well as Rose's concurrent assurances and conduct, led Mr. Joseph to believe that the work he would be performing as Genesis's Chief IP Officer would ultimately be assigned to and benefit Genesis.  Mr. Joseph would not have left his federal government job, signed the Employment Agreement, or taken on any other role at Genesis, otherwise.

### D.     Stock Grant Agreement

29.     On February 17, 2020, Mr. Joseph and Genesis executed a Restricted Stock Grant Agreement, a true and correct copy of which is attached hereto as <u>Exhibit C</u> (the "Stock Grant Agreement").

30.     Under the Stock Grant Agreement, Mr. Joseph was granted 1,000 shares in the stock of Genesis, valued at the time by the Board of Directors at $200 per share.  Mr. Joseph understood that his work as CIPO of Genesis would be assigned to Genesis and increase the value of the shares he was granted. Otherwise, Mr. Joseph would not have worked tirelessly and above-and-beyond the requirements of his Employment Agreement, or remained with Genesis at all, to add value to the intellectual property as CIPO.

Copy from re:SearchTX

### E.   Mr. Joseph's Performance of His Duties

31.   Mr. Joseph dutifully performed all of his obligations under the Employment Agreement.  Specifically, throughout its duration, Mr. Joseph worked diligently to develop a robust portfolio of intellectual property rights relating to Bitcoin ATMs, which he understood (pursuant to the terms of the Employment Agreement and other statements and conduct by Rose) would be assigned to Genesis, or that Mr. Joseph would receive a share of its value.

32.   Throughout this period, Mr. Joseph contributed to the issuance of 10-15 United States patents, dozens of patent applications, and a variety of other non-patent IP rights related to the functionality of Bitcoin ATMs.

33.   Rose instructed Mr. Joseph to submit all patent applications related to Genesis under Rose's name.  Mr. Joseph researched and prepared the applications as a Genesis employee, which Mr. Joseph would then submit to Rose for signature.  At one point, Rose told Mr. Joseph that Rose was not interested in reviewing any of these applications, and instructed Mr. Joseph to apply Rose's signature for Rose.  Mr. Joseph refused.

34.   Rose's representations and conduct, as  well as the Employment Agreement, had led Mr. Joseph to believe that, even though the IP portfolio Mr. Joseph was generating was legally vesting in Rose's name, Rose would take the required steps under the Employment Agreement to assign the portfolio to Genesis.  Mr. Joseph also took comfort in the fact that Rose was the CEO of Genesis, and therefore owed Genesis and its shareholders a fiduciary duty against fraud or self-dealing.

Copy from re:SearchTX

F.      **Mr. Joseph's Termination**

35.      As it turned out, Rose never allowed for Mr. Joseph's work or inventions to be assigned to Genesis, the party with whom Mr. Joseph contracted.  Instead, Rose decided to keep these assets for himself.

36.       Not only was Mr. Joseph himself a shareholder of Genesis, but Mr. Joseph also took his role as an officer of Genesis seriously.  As such, Mr. Joseph confronted Rose and raised concerns regarding the mismanagement of Genesis, such as Chief Strategy Officer Peter Sentowski's failure to revamp the Company's Software License Agreement, which Mr. Joseph spearheaded himself.

37.      Promptly after Mr. Joseph raised these concerns, Rose and Genesis retaliated against Mr. Joseph.  Acting through their agent, Sentowski, in the course of 2021, Rose and Genesis (i) began withholding Mr. Joseph's contractual bonus payments; (ii) stopped increasing Mr. Joseph's salary as required by the Employment Agreement; and (iii) assigned Mr. Joseph new burdensome work procedures including writing "reports."  These actions constituted materially adverse employment actions and were taken as a result of Mr. Joseph's discharging his duty as a fiduciary of Genesis by investigating potential mismanagement.

38.      On March 14, 2022, Rose sent an e-mail to Mr. Joseph, stating "I've decided to redeem everyone's [Restricted Stock Units] at $200/share – you should be getting a DocuSign with the redemption agreement soon."

39.      Rose's March 14 e-mail alarmed Mr. Joseph because the redemption value was no greater than the $200 per share valuation when the shares were initially issued.  The redemption price did not reflect any of the value of any of the intellectual property that Mr. Joseph believed he had contributed to Genesis.  Nor did the redemption price reflect Genesis's significant

Copy from re:SearchTX

revenue increases–on information and belief, Genesis's sales revenue increased from over $30 million in 2020 to over $70 million in 2021.  The same day, Mr. Joseph asked Rose for an explanation.  Rose said simply:  "It's my company.  You're paid for all this stuff."  When Mr. Joseph continued to press, Rose stated:  "Dude.  Unreal.  You'll be getting an email later."

40.     Mr. Joseph refused to sign the draft stock "redemption agreement."

41.     The next day, on March 15, 2022, Rose sent an e-mail to Mr. Joseph purporting to terminate Mr. Joseph's employment.  Rose explained:  "You got a lot of IP work done and for that I am grateful."  Rose's pretext for the termination was that "the pace of IP has slowed considerably in the last 12 months – we have gotten very little issued…That's okay, I understand the constraints of the system and I am overall pleased."  Rose stated he was offering [Mr. Joseph] a "generous" package to part ways amicably - "classifying this as a resignation, in lieu of termination… and redemption of your shares at $200, rather than $25, per share. If you do not sign the separation agreement (attached) and redemption agreement (sent via DocuSign), then you would be terminated…"  In reality, Rose was attempting to bully Mr. Joseph into accepting the cheap buy-out ultimatum by threatening to withhold the rest of Mr. Joseph's contractual salary and to redeem Mr. Joseph's shares for only $25 per share.  Rose sent a draft "separation and release agreement" (which would release Rose of any legal claims against him by Mr. Joseph) for Mr. Joseph to sign and return.

42.     Mr. Joseph refused to sign the draft "separation and release agreement."  Rather, in order to evaluate Rose's offer, on March 16, 2022, Mr. Joseph asked for all performance and due diligence records.  Among his other questions about potential mismanagement, Mr. Joseph wanted to investigate which entity was being credited for the intellectual property portfolio that Mr. Joseph had developed.  Rose's own draft "redemption agreement" entitled Mr. Joseph to

Copy from re:SearchTX

request such information, as well as required Mr. Joseph to certify that he had conducted a "Full Investigation" into the value of Mr. Joseph's shares.

43.     Rose provided a 2021 tax return for Genesis but refused to provide any other documentation.  Rose refused to provide any documentation for Aquarius, stating that Mr. Joseph "only h[e]ld shares in Genesis Coin, Inc."  Instead, Rose then sent a revised "redemption agreement," in which Rose had stricken out the "Full Investigation" paragraph entitling Mr. Joseph to request documentation.  Mr. Joseph re-iterated his demand for the documents, explaining that basic diligence is proper for any stock sale even if the "Full Investigation" paragraph is stricken, but Rose continued to refuse.

44.     On information and belief, in 2021, Genesis grossed over $70 million in revenue, but paid less than $1 million in federal taxes and less than $45,000 in Texas taxes.

45.     On March 18, 2022, Mr. Joseph sent another email to Rose requesting documentation:  "This is my third request since I have not heard back. It appears that you are refusing to disclose this and other information requested. Rather than striking paragraphs regarding a 'Full Investigation,' please disclose all information that I am entitled to receive/know regarding all activities of Genesis Coin, Inc. immediately."

46.     Instead of the documentation, Mr. Joseph received a letter from the law firm Holland & Hart, acting as counsel for Genesis, which stated that "Genesis terminated [Mr. Joseph's] employment effective March 15, 2022."  The letter also made new false accusations alleging misconduct by Mr. Joseph.  Both the termination and the false accusations constituted materially adverse employment actions and were taken as a result of Mr. Joseph's discharging his duty as a fiduciary of Genesis by investigating potential mismanagement.

Copy from re:SearchTX

On information and belief, to this day, Rose still has not transferred to Genesis any of the IP portfolio that Mr. Joseph developed for Genesis.  This failure constitutes a breach of the Employment Agreement.

## VII.
## COUNT ONE:  RETALIATION

47.     All facts and allegations in the preceding paragraphs are incorporated herein by reference.

48.     By questioning and investigating Rose's mismanagement of Genesis, Mr. Joseph engaged in protected activities under Texas statutory and common law.

49.     By, among other conduct, denying bonuses, withholding contractual pay increases, and terminating Mr. Joseph, Defendants Rose and Genesis took materially adverse employment actions against Mr. Joseph.

50.     These materially adverse employment actions were taken because Mr. Joseph engaged in protected activities.

51.     Mr. Joseph suffered damage as a result of the materially adverse employment actions.

## VIII.
## COUNT TWO:  BREACH OF CONTRACT

52.     All facts and allegations in the preceding paragraphs are incorporated herein by reference.

53.     The Employment Agreement and Stock Grant Agreement executed between Mr. Joseph and Genesis are valid, express contracts.

54.     Mr. Joseph performed and/or tendered performance under the Employment Agreement and Stock Grant Agreement at all relevant times.

Copy from re:SearchTX

55.     Genesis breached the Employment Agreement by terminating Mr. Joseph without cause and without any justification under the Employment Agreement.

56.     Rose also caused Genesis to breach the Employment Agreement by denying assignment of the applicable intellectual property developed by Mr. Joseph to Genesis, as required by § 9(d) and other sections of the Employment Agreement.

57.     Genesis also breached the Employment Agreement by failing to pay Mr. Joseph the full salary, bonuses, unused compensation, sick leave and/or vacation leave, to which Mr. Joseph was entitled.

58.     Genesis breached the Stock Grant Agreement at least by unlawfully and unfairly terminating Mr. Joseph's employment, and by purporting to assign and transfer Mr. Joseph's shares as a function of the retaliation against him described *supra*.

59.     Mr. Joseph was damaged as a result of all breaches, including without limitation, by losing income and by lost value of shares.

IX.
<u>COUNT THREE:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING</u>

60.     All facts and allegations in the preceding paragraphs are incorporated herein by reference.

61.     The Stock Grant Agreement executed between Mr. Joseph and Genesis is a valid, express contract, under which Mr. Joseph and Genesis have existing obligations.

62.     The Stock Grant Agreement contains an implied covenant of good faith and fair dealing.

63.     Mr. Joseph performed and/or tendered performance under the Stock Grant Agreement at all relevant times.

Copy from re:SearchTX

64.     Genesis unreasonably and unfairly interfered with Mr. Joseph's right to receive the benefits of the Stock Grant Agreement, including without limitation, by unfairly terminating Mr. Joseph, by preventing Mr. Joseph from receiving the benefits the contract, by withholding information to prevent Mr. Joseph from understanding the value of his rights under the contract, and by engaging in conduct that was unreasonable and deceitful.

65.     Mr. Joseph was damaged as a result of all breaches, including without limitation, by losing income and by lost value of shares.

X.
COUNT FOUR:  FRAUDULENT INDUCEMENT

66.     All facts and allegations in the preceding paragraphs are incorporated herein by reference.

67.     Defendants misrepresented the relevant facts and their intention to perform under both the Employment Agreement and the Stock Grant Agreement.  Specifically, Rose misled Mr. Joseph to believe that Mr. Joseph would be working and developing intellectual property primarily for Genesis, not Rose or his other companies.  Rose's misrepresentations include, but are not limited to, the text of the Employment Agreement itself, numerous e-mails sent from Rose to Mr. Joseph, and numerous phone or in-person conversations between Rose and Mr. Joseph during Mr. Joseph's employment and before.

68.     On information and belief, these misrepresentations were made with knowledge of their falsity.

69.     On information and belief, Defendants made these misrepresentations with the intention that Mr. Joseph should rely on them—specifically, by executing the Employment Agreement and Stock Grant Agreement.

16

Copy from re:SearchTX

70.     Mr. Joseph did, in fact, rely on Defendants' misrepresentations and executed the Employment Agreement and Stock Grant Agreement.  Mr. Joseph's reliance on Defendants' misrepresentations was reasonable under all circumstances.

71.     If Mr. Joseph had known these misrepresentations to be false at the time, he never would have entered into the Employment Agreement or the Stock Grant Agreement.  Therefore, the misrepresentations fraudulently induced Mr. Joseph to execute the contracts.

72.     Mr. Joseph has suffered damage as a result of his reliance on the misrepresentations.

## XI.
## COUNT FIVE:  STRING-ALONG FRAUD

73.     All facts and allegations in the preceding paragraphs are incorporated herein by reference.

74.     During the course of Mr. Joseph's performance under the Employment Agreement, Defendants continued to misrepresent the relevant facts and their intention to perform.  Specifically, even after Mr. Joseph learned that Rose intended to keep the intellectual property portfolio in his own name, he stayed in the Employment Agreement because Defendants assured Mr. Joseph that he would receive a share of the value of his intellectual property work and development.  Additionally, Defendants' conduct led Mr. Joseph to believe they would continue to perform as required under the Employment Agreement, but then halted Mr. Joseph's bonuses and salary increases without notice.  If Mr. Joseph had known these misrepresentations to be false at the time, he would have terminated the Employment Agreement immediately.

75.     On information and belief, these misrepresentations were made with knowledge of their falsity.

Copy from re:SearchTX

76.     On information and belief, Defendants made these misrepresentations with the intention that Mr. Joseph should rely on them—specifically, by not terminating the Employment Agreement and continuing to have him develop IP.

77.     Mr. Joseph did, in fact, rely on Defendants' misrepresentations and stayed in the Employment Agreement, performing all of his obligations thereunder, until Defendants purported to terminate it in March 2022.

78.     If Mr. Joseph had known these misrepresentations to be false at the time, he never would have entered into the Employment Agreement or the Stock Grant Agreement or would have resigned immediately upon learning as much.  Therefore, the misrepresentations fraudulently induced Mr. Joseph to stay in the Employment Agreement and constitute string-along fraud.

79.     Mr. Joseph has suffered damage as a result of his reliance on the misrepresentations.

## XII.
## COUNT SIX:  UNJUST ENRICHMENT

80.     All facts and allegations in the preceding paragraphs are incorporated herein by reference.

81.     Defendants Genesis and Rose have been unjustly enriched by Mr. Joseph's talent and labor.

82.     On information and belief, Defendants Genesis Services and Aquarius have been unjustly enriched by Mr. Joseph's talent and labor.

83.     Defendants' acquisition of these benefits occurred at the detriment of Mr. Joseph.

84.     The Employment Agreement–under which Mr. Joseph performed his work and remained in–was procured by fraud.

Copy from re:SearchTX

## XIII.
## <u>DAMAGES</u>

85.     All facts and allegations in the preceding paragraphs are incorporated herein by reference.  As a direct and proximate result of the occurrences made the basis of this lawsuit, Mr. Joseph was caused to suffer the following damages in an unliquidated amount to be determined by a jury:

(a) Actual and/or consequential damages

(b) Lost profits/income;

(c) Lost opportunities;

(d) Lost earning potential;

(e) Lost value of inventions;

(f)  Lost value of shares;

(g) Exemplary damages; and

(h) Attorneys' fees and costs of suit.

## XIV.
## <u>ATTORNEYS' FEES AND COSTS</u>

86.     Mr. Joseph is entitled to recover his reasonable attorneys' fees and costs pursuant to Tex. Civ. Prac. & Rem. Code § 38.001.  Furthermore, Mr. Joseph is entitled to "all costs and attorneys' fees incurred by the non-breaching party as a result of the breach or in enforcing the terms of this Agreement.  Exhibit B, § 16.

## XV.
## <u>EXEMPLARY DAMAGES</u>

87.     All facts and allegations in the preceding paragraphs are incorporated herein by reference.  Mr. Joseph is entitled to recover exemplary damages against Defendants as a result of their fraud, malice, and gross negligence.  *See* Tex. Civ. Prac. & Rem. Code § 41.003.

Copy from re:SearchTX

## XVI.
## CONDITIONS PRECEDENT

88.     All conditions precedent to Mr. Joseph's right to recover on his claims have been

satisfied, discharged, occurred, or waived.

## XVII.
## RULE 193.7 NOTICE

89.     Pursuant to Tex. R. Civ. P. 193.7, Mr. Joseph hereby notifies Defendants of Mr.

Joseph's intention to use, at any pretrial proceeding and/or at trial, any documents produced by

Defendants in response to Mr. Joseph's written discovery requests.

## XVIII.
## DEMAND FOR JURY TRIAL

90.     Mr. Joseph hereby demands a jury trial and tenders the fee with this Petition.

## XIX.
## NOTICE REGARDING INITIAL DISCLOSURES

91.     Please take notice that, pursuant to Tex. R. Civ. P. 194.2, the parties are required

to exchange Initial Disclosures—the information and documents required under Tex. R. Civ. P.

194.2(b)—without a request within thirty (30) days after the filing of the first answer or general

appearance.

92.     Pursuant to Tex. R. Civ. P. 194.2(a), a party that is first served or otherwise joined

after the filing of the first answer or general appearance must make the Initial Disclosures within

thirty (30) days after being served or joined.

## XX.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff Shawn Joseph respectfully prays

that Defendants Genesis Coin, Inc., Genesis Services, Inc., Evan Rose, and Aquarius

Copy from re:SearchTX

Management Corp. be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for Mr. Joseph against Defendants as follows:

(a)     for direct, consequential, special, and compensatory damages in an amount to be proven at trial;

(b)     for pre- and post-judgment interest at the maximum rate allowed by law;

(c)     for temporary and/or preliminary injunctive relief;

(d)     for equitable re-assignment of patents and/or other intellectual property rights;

(e)     for exemplary damages;

(f)     for attorneys' fees and costs of suit; and

(g)     for such other and further relief to which Mr. Joseph may be entitled at law or in equity.


Respectfully submitted,

MARCUS L. FIFER LAW FIRM, PLLC


By:     */s/ Marcus L. Fifer*
Marcus L. Fifer
Texas Bar No. 24104629
P.O. Box 6501
Austin, TX 78762
Tel. (512) 487-0324; Fax. (512) 598-0298
Email:  marcus@fifer.law

THE VORA LAW FIRM, P.C.
201 Santa Monica Blvd., Ste. 300
Santa Monica, CA 90401
Tel. (424) 258-5190; Fax. (512) 598-0298
Nilay U. Vora (*pro hac vice forthcoming*)
Email:  nvora@voralaw.com
Jeffrey A. Atteberry (*pro hac vice forthcoming*)
Email:  jatteberry@voralaw.com

Copy from re:SearchTX

William M. Odom (*pro hac vice forthcoming*)
Email:  will@voralaw.com

*Attorneys for Plaintiff Shawn Joseph*

Copy from re:SearchTX

# EXHIBIT A

Copy from re:SearchTX

*The*
BITCOIN RESERVE
*Journal*



BUSINESS

# Persona: Evan Rose

An interview with Evan Rose of Genesis Coin and
Aquarius.

YURI DE GAIA
30 APR 2020  •  8 MIN READ



"For me it was never about building kiosks. It was about being part of something bigger, the opportunity to play even a small role in what could pave the way for a more equitable future."

You've successfully subscribed to The Bitcoin Reserve Journal!

Share          

Copy from re:SearchTX

*The*
BITCOIN RESERVE
*Journal*

---

*Evan Rose is the founder of Genesis Coin, a bitcoin kiosk company, and Partner at Aquarius, a technology consulting firm.*

*Find Evan on Twitter and LinkedIn.*

### You live in Puerto Rico. What made you move? How is the business environment there?

I had been living a pretty ordinary life in San Diego sharing a small house with a friend. Back then, in 2012, 2013, most of my time was spent at home doing contract software development for a local precious metals company or tinkering in our garage on the original Genesis1 machine. I was pretty comfortable, dating my high school sweetheart, playing Diablo, and evangelizing Bitcoin to whomever would lend a 22 year old their ear. While the gold and silver markets had gone parabolic in 2011, my contract did not survive the crash and prolonged bear market that followed.

I started focusing more on getting the ATM in the garage to work. I made some progress, but, while things were moving forward with the business, the stress of needing to make something happen exacted its toll on my relationship and eventually we went our separate ways. I finally had some customers, which gave me the confidence to get out of the small town where I grew up and make a move to Austin, TX. I knew the business environment there was very friendly and it had a reputation for being a little eccentric. It was a great time, I met some very dear friends.

You've successfully subscribed to The Bitcoin Reserve Journal!

Share         

Copy from re:SearchTX

government was experimenting with novel approaches to jump start the economy and bring new opportunities to the island. Part of that approach was to offer financial incentives for individuals and businesses to relocate, contingent on them investing in the island and creating jobs. I loved Austin, but I also knew that I was in yet another American city, once again comfortable. And isn't it a shame that 10 years of public school Spanish language education had all but circled down the drain? I decided to apply, and shortly thereafter I was riding a 1-way ticket to San Juan.

Operating a business in Puerto Rico is more complex than what one would expect coming from the domestic USA, but it's doable, and it's deeply rewarding. I've been really impressed with the professionalism and technical acumen of my associates here. Puerto Rico is home to some incredible STEM-oriented public universities which produce high calibre graduates. The quality of the Genesis software is in no small part due to the technical talent I've recruited on the island.

### Has bitcoin been gaining traction in Puerto Rico? If so, what are primary use-cases?

There is a small and growing scene of enthusiasts but outside of a few meetups and local businesses it's been pretty quiet. I was encouraged recently though when my company went to a job fair at the public university and we were approached by many young people interested in Bitcoin and wanting to get involved. After Hurricane Maria my company partnered with local organizations to distribute and install water filters across the island. Many of the students working on the water filter project reached out to me to learn more about the industry and possible opportunities. The interest is definitely there but it still feels early.

You've successfully subscribed to The Bitcoin Reserve Journal!

Share            

*The*
BITCOIN RESERVE
*Journal*

for the last 6 weeks. Some associates have fallen ill — luckily not from the virus — but needless to say the environment has been trying to work in. The pace has slowed down. We continue to push commits and iterate every day. The island is slated to "re-open" on May 3rd and I'm hopeful there is some resolution because our work is our passion, and there is a tendency for things to turn lackluster when every day is the same. Overall though myself and the team are just extremely grateful to have the ability to continue to work. I've been more concerned about the broader situation on the island and was elated to know Brock Pierce, his wife, and some other local Bitcoiners had put together a foundation to help keep Puerto Rico fed during these trying times, so I've been contributing to that.

Feed Puerto Rico COVID-19 Hunger Relief

Integro Foundation



### Genesis Coin is one of the first bitcoin ATM hardware and software providers in the world. How did you come up with the idea?

I was developing software for a local precious metals company at the time, and everyone ragged on me whenever I brought up the idea of Bitcoin. The usual tripe of "it's not backed by anything," "it's a ploy by the government," "it will be hacked." I knew about it in 2011 but only after the metals markets imploded and my consulting income with it, did I decide to actually buy some and experience it for myself. That's when I realized I

You've successfully subscribed to The Bitcoin Reserve Journal!

Share            

Copy from re:SearchTX

The
BITCOIN RESERVE
Journal

I was driving to Ramona, California to an address that turned out to be a quaint house in the California countryside. There, I met Todd Bethell, the only human to answer my plea to bestow upon me a few satoshi so I could see what this Bitcorn thing was all about. Todd was a gregarious fellow who had been running a professional printing business and just happened to fall in love with Bitcoin early on. I was really interested in the technology and we chatted for hours. When he learned I was a software developer, his eyes lit up, and he pulled me into his garage. There sat the fossilizing cobweb-draped remains of a long-shuttered project: the world's first Bitcoin ATM. Or BitBill dispenser. Or something. I don't know exactly what the plan was with that machine but it did look gorgeous, embossed with a large dust-covered backlit topper scintillating with a perfectly printed gloss gold Bitcoin logo. Todd told me that he bought the kiosk off the shelf and enlisted Eric Lombrozo to help him write the software. They had gone their separate ways and Todd inquired as to whether I would like to buy the machine. I didn't know anything about kiosks and I respectfully declined but, being a bit of a domain name hoarder asked whether he would be interested in selling me BitcoinATM.com. He was. I could have the domain name! But I had to take the kiosk with me. And that's how I ended up with the world's first BitcoinATM fossilizing, dust-covered, and cobweb-ridden in my parent's garage.

**According to Coinatmradar.com, your bitcoin kiosks are the most widespread in the world. What was the major factor in Genesis Coin's success?**

Originally my plan was not to actually build a business, but instead hold onto the domain name as an investment. However, after playing with

You've successfully subscribed to The Bitcoin Reserve Journal!

Share   

Copy from re:SearchTX

The
BITCOIN RESERVE
Journal

Bitcoin had a reputation and no one wanted to touch it. No one, that is,
except an incredible manufacturer out of South Korea. They were
innovators in what was at the time, a pretty inert industry. They were a
relative newcomer to the space, and since 2006 had quickly developed a
reputation for quality and reliability. They had demonstrated a
willingness to build custom platforms for their customers, and were
quickly capturing market share. They took a chance on me, they had the
foresight to see that it could be a real opportunity when almost no one
else did. I sold my Ninja 250 and my surfboard and emptied my bank
account, my entire net worth chicken-scratched onto a wrinkled check
and dropped nonchalantly into a blue USPS mail drop. A few weeks later a
freight truck arrived with everything I needed to occupy myself for the
next 7 years. Their willingness to take a bet on me provided a bedrock for
me to focus on the software. I never worried about the hardware platform
because they had built and shipped over a hundred thousand units all
over the world before we got started. I was literally     and to no credit of
my own     standing on the shoulders of giants.  This is a common theme,
and extends to my teammates. I've been very lucky with them, across the
board. With the hardware taken care of I became laser-focused on getting
the software to work. I listened to the operators. I pushed a lot of code. I
let the customers guide the design decisions and roadmap. I stayed up til
3am building features, tiptoeing into the garage to test them so as not to
wake my roommate. I honored their willingness to take a chance on me
with persistent hard work. I was fanatical about making things happen.
For me it was never about building kiosks. It was about being part of
something bigger, the opportunity to play even a small role in what could
pave the way for a more equitable future.

**There has been a lot of fraud involving bitcoin kiosks over the years, tax**

You've successfully subscribed to The Bitcoin Reserve Journal!

Share              

*The*
BITCOIN RESERVE
*Journal*

conjunction with our customers, based on their direct experience dealing with these awful situations. They have provided invaluable feedback and we've transformed their knowledge into a suite of tools dedicated towards keeping people safe and secure when transacting at these kiosks.

### What is the future of the bitcoin kiosk industry? Are banks with their vast networks of ATMs potential competitors? What about over-the-counter handheld terminals?

The future is bright. Most of the legacy hardware is not well-positioned to process fiat to Bitcoin transactions. Marrying the old world with the new is a nuanced affair, whose finality is perfectly serviced by a Bitcoin ATM. I believe these kiosks will remain a mainstay for onboarding new users and servicing existing users for many years to come.

### Do you think bitcoin needs mass adoption, or can it remain a niche currency and still be considered a success?

It's been 11 years now, Bitcoin has never wavered from its promise of being a permission-less network. Not many promises made in that era have been kept. There will only ever be 21 million coins. In the court of intellectual honesty, Bitcoin has won many times over. Against all odds, it's a smashing success.

### Where are the biggest business opportunities in the industry?

I believe we are on the cusp of seeing some really cool apps built on

You've successfully subscribed to The Bitcoin Reserve Journal!

Share            

Copy from re:SearchTX

*The*
**BITCOIN RESERVE**
*Journal*

force yourself to be multi-disciplinary. Bitcoin is in many ways a renaissance technology, sitting at the intersection of seemingly boundless different verticals and bodies of thought. It's got something for everyone. Identify your weaknesses and know when to delegate. Try to get a little better every day. And most importantly, never ever give up.

MORE IN BUSINESS

### Persona: Louis Liu
22 Jul 2020 – 6 min read

### Persona: Stephen Cole
25 May 2020 – 5 min read

### Persona: Stephan Livera
21 Apr 2020 – 5 min read

See all 5 posts →



RESEARCH

You've successfully subscribed to The Bitcoin Reserve Journal!

Share            



*The*
BITCOIN RESERVE
*Journal*



FINANCE

## Bitcoin as a Hedge Against Coronavirus-Led Economic Chaos

Bitcoin was once dubbed the "evil spawn of the financial crisis." Ironically it might be the only thing that can save us from another. Here's why the argument for Bitcoin is only growing stronger amid the global economic crisis.

**WILL HEASMAN**
27 APR 2020 · 6 MIN READ

The Bitcoin Reserve Journal © 2022 | Bitcoin Reserve | An L2B Global entity | Contribute an article

Latest Posts

Share         

Copy from re:SearchTX

# EXHIBIT B

Copy from re:SearchTX

DocuSign Envelope ID: 5364C85A-9097-40D6-8291-584D9A6A8086

# EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made and entered into from November 1, 2019, the Effective Date, executed herein, by and between Genesis Coin, Inc. (the "Company"), a Delaware C-Corp, and Shawn Joseph, a Texas resident.

## RECITALS:

A.    The Company is a crypto currency transaction software platform developer and distributor of kiosks, which runs the Genesis software platform exclusively.

B.    The Employee has expertise and knowledge in examining intellectual property and is a technological generalist with a broad depth of knowledge spanning the spectrum of software development, cloud computing platforms, and computer hardware.

C.    The Company desires to retain the services of the Employee in order to assist the Company in the analysis, development and implementation of the Company's intellectual property strategy as "CIPO", Chief Intellectual Property Officer.

D.    The Employee is willing to provide services to the Company, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the promises and agreements herein contained and intending to be legally bound, the parties agree as follows:

1.    <u>Service of Employee</u>.  The Company hereby hires the Employee to act and serve as CIPO for the Company pursuant to the terms and conditions of this Agreement and as may from time to time be directed by the Company.

2. <u>Duties.</u>  Throughout the term of Employee's employment, the Employee shall assist the Company in creating and implementing the Company's intellectual property strategy, with particular emphasis on analyzing the Company's existing portfolio of products to determine and execute on intellectual property opportunities. The Employee shall report the results of his efforts to Evan Rose (hereinafter the "Founder")  and Peter Sentowski (hereinafter the "President") or as may be otherwise directed by the Company from time to time, and shall consult with the Founder/President in determining specific objectives and direction of the Company's IP strategy. The Employee shall at all times perform his duties and discharge his responsibilities under this Agreement diligently and conscientiously, and to the best of his ability. The Employee shall not have the authority to contractually bind the Company at this time but would be called to do so upon execution of an offer letter and designation as an officer of the company.

Copy from re:SearchTX

3. <u>Term of Employment</u>.   The Term of Employee's employment shall commence November 1, 2019 (the "Effective Date"), and shall continue thereafter for a period of three (3) years, unless sooner terminated in accordance with the provisions of Section 4 below.   Thereafter, the term of Employee's employment shall be renewed for successive periods of one year each, unless (a) the Company or the Employee shall have given 30 days prior written notice of intent to terminate Employee's employment at the end of the then-current Term (references herein to the "Term" of Employee's employment shall include references to the initial and to any renewal or extended Terms of employment), or (b) Employee's employment is sooner terminated in accordance with the provisions of Section 4 below.

4.   <u>Termination of Employment</u>.   Employee's employment hereunder shall terminate upon the first to occur of the following circumstances:

(a)   The expiration of the Term of Employee's employment pursuant to timely notice given in accordance with Section 3, above;

(b)   The death or total and permanent disability of the Employee (for this purpose, "disability" shall refer to a physical, mental or emotional condition that renders the Employee unable to perform his obligations as set forth in this Agreement for any significant period of time during the Term of Employee's employment);

(c)   The Company's election to terminate Employee's employment due to the material breach by the Employee of any of the Employee's covenants under this Agreement, including, but not limited to, those covenants set forth in Sections 7, 8 and 11 hereof; or

(d)   The Company's election to terminate Employee's employment for "Cause."   For purposes of this Agreement, "Cause" shall include, but shall not be limited to, dishonesty, negligence, fraud, embezzlement, habitual insobriety, conviction of a crime involving moral turpitude, willful destruction or misappropriation of Company property, or willful commission of an act materially injurious to the Company's business, or the Employee's failure to perform his responsibilities in a competent, professional manner, as determined by the Company's Board of Directors in the exercise of its sole discretion.

(e)  The passage of 30 days after either the Company's or Employee's delivery of written notice to the other of intention to terminate employment.

(f)  The Employee ceases to be a bonafide Texas resident.

5.   <u>Compensation of Employee; Expense Reimbursements; Benefits</u>.

2

Copy from re:SearchTX

DocuSign Envelope ID: 5364C85A-9097-40D6-B891-F94D9A648086

(a)     In consideration of the services to be provided by the Employee pursuant to this Agreement, the Company shall pay to the Employee, a base salary of $110,000 per year plus benefits identified in subsection (c) below. The Company will increase the base salary on an annual basis as agreed upon in the officers compensation agreement. In addition to the incentive compensation set forth above, Employee shall be eligible for a variable bonus compensation, equity and profit sharing detailed in Exhibit A, as well as performance-based compensation bonuses for any intellectual property issued to the company as a result of Employee's efforts.

(b)     The Company will reimburse the Employee for approved travel and related expenses incurred by the Employee, when the Employee must travel away from the general area in which the Employee's office is located in Austin, Texas. Notwithstanding the foregoing, the Company shall reimburse the Employee for reasonable office expenses, travel expenses, lodging and meals while the Employee is traveling on the Company's business.

(c)     In addition to the salary referred to above, the Company shall provide health, vision, dental and life insurance benefits to Employee and dependents, up to $350 per month, and a technology budget of $2,000 per year. Without limiting the foregoing, the Company shall grant to the Employee vacation that may be taken by employee at his discretion.

6.     <u>Maintenance of Office.</u>    The Employee will work remotely in Austin, Texas and does not need to maintain his office at the Company headquarters.

7.     <u>Noncompetition.</u>

(a)     The Employee shall not at any time during the Term of Employee's employment render any services, directly or indirectly for any Competitor.

(b)     The Employee shall not, at any time during the Term of Employee's employment, directly or indirectly influence or attempt to influence, either directly or indirectly, any employee of the Company or any Employee to the Company or of any affiliated entity to leave or terminate such individual's employment or service with the Company or with any affiliate of the Company.  In the event that any employee of the Company terminates his employment with the Company and undertakes employment, directly or indirectly with Employee, Employee's agents or employers within six (6) months of the termination of Employee's employment hereunder, Employee shall be presumed to have violated this section 8(b).

(c)     For purposes of this Agreement, the term "Competitor" shall mean any individual (including the Employee) or entity that at any time is directly

Copy from re:SearchTX

DocuSign Envelope ID: 5354C85A-9097-40D6-B981-584D9AC818086

or indirectly (for example, through an affiliated or controlled individual or entity) engaged in the development of crypto currency kiosk transaction software.

(d)     The Employee, unless directed by the Company, shall not at any time during the period of the Employee's employment with the Company directly or indirectly influence or attempt to influence, either directly or indirectly, any customer or client of the Company or of any affiliated entity to discontinue using the services of, or to cancel or fail to renew a contract with, the Company or an affiliate of the Company.

(e)     The Employee agrees and acknowledges that the breach by the Employee of any of the provisions of this Section will cause the Company irreparable damage, that the remedy at law for any such breach would be inadequate, and that the Company, in addition to any other relief available to it, shall be entitled to immediate temporary and permanent injunctive relief appropriately restraining Employee from committing or continuing such breach.

8.     <u>Confidential Information</u>.

(a)     The Employee shall never, unless directed by the Company, either during the period of the Employee's employment by the Company or thereafter, disclose to any other individual or entity any Confidential Information.  The Employee acknowledges and agrees that all Confidential Information is proprietary to the Company, is extremely important to the Company's business, and that the disclosure of such Confidential Information to a Competitor could have a materially and adversely affect the Company, its business and its customers.

(b)     Upon any termination of the Employee's service with the Company, the Employee shall leave with or return immediately to the Company any and all records and any and all compositions, articles, devices and other similar or related items that disclose or contain any Confidential Information, including all copies or specimens thereof, whether in the Employee's possession or under the Employee's control, or whether prepared by the Employee or by others.

(c)     For purposes of this Section, the term "Company" shall refer to the Company and to any corporation or other entity that is owned or controlled, directly or indirectly, by Company or that is under common ownership or control with the Company.

(d)     For purposes of this Agreement, the term "Confidential Information" shall mean information in any form that is not generally known to the public that relates to the Company's past, present or future operations, processes, products or services, including without limitation information that relates to the Company's product designs or to the applications or uses of the same, or to any market research, customer

Copy from re:SearchTX

DocuSign Envelope ID: 5354C85A-9097-40D6-B98E-F94D9A6A8086

development, marketing, purchasing, accounting, maintenance, operations, engineering, merchandising, advertising, selling, leasing, financing or business methods or techniques (including without limitation customer lists, records of customer purchases and requirements, and like and similar information relating to actual or prospective customers) that is or may be related thereto including any future business the Company may engage in during the term of Employee's employment. All information disclosed to the Employee or to which the Employee obtains access during any period of employment with the Company, whether pursuant to this Agreement or otherwise, or to which the Employee obtains access by reason of this Agreement or his service to the Company, that the Employee has a reasonable basis to believe is or may be Confidential Information, shall be presumed for purposes of this Agreement to be Confidential Information.

9.     <u>Inventions</u>.

(a)     Immediately upon its discovery or completion, the Employee shall promptly and fully disclose each Invention involving the Company's business in writing to the Company. The Employee shall make this disclosure regardless of whether an Invention is discovered, conceived or completed by the Employee alone or jointly with others.

(b)     The Employee hereby assigns, and agrees to assign, to the Company, or nominee, all of the Employee's rights in and to all Inventions and in and to any and all letters patent or copyrights or applications therefor at any time granted or made, whether in the United States of America or in any foreign nation, upon or with respect to any Invention involving the Company's business discovered while executing on Company's objectives.

(c)     The Employee shall from time to time execute, acknowledge and deliver promptly to the Company (without charge to the Company but at the expense of the Company) such written instruments and documents, and shall take such other and further action with respect to any Invention, as may be necessary or desirable in order to enable the Company to obtain and maintain patents and/or copyrights therein, or to vest the entire right title and interest thereto in the Company.

(d)     The Company shall not assert any rights under any Inventions as having been made or acquired by the Employee prior to the commencement of the Employee's service with the Company.

(e)     For purposes of this Agreement, the term "Inventions" means discoveries, developments, improvements and ideas (whether or not shown or described in writing or reduced to practice) and works of authorship (including computer software), whether or not patentable or copyrightable, (i) that relate directly to the kiosk, digital signage point of sale equipment, cash handling equipment, and point of interaction

Copy from re:SearchTX

equipment business; (ii) that relate to the Company's actual or demonstrably anticipated research or development with respect to the any of the foregoing; (iii) that result from any services at any time performed by the Employee for the Company, whether pursuant to this Agreement or otherwise; (iv) for which equipment, supplies, facilities or trade secret information of the Company is used; or (v) that are developed in pursuance of the Employee's service to the Company pursuant to this Agreement.

10.    <u>Assignment</u>.  The Company may assign its rights and may delegate its duties under this Agreement to a purchaser of all or any substantial portion of the assets of the Company, and upon such assignment and assumption by the assignee of the terms of this Agreement, the Company shall be relieved all further obligation hereunder.

11.    <u>Compliance with Law and Regulation; Noncontravention</u>.    The Employee shall comply with all laws, rules, regulations of any governmental or regulatory body having jurisdiction of any phase of the services performed hereunder. The Employee shall indemnify, defend, and save the Company and its affiliates harmless from and against all claims, damages and liability which may result from the Employee's failure to comply with this Section.   The Employee represents and warrants that the execution of this Agreement, performance of the services described herein and compliance by the Employee with the provisions of this Agreement will not result in any breach of any of the terms, conditions, or provisions of, or constitute a default under, any indenture, agreement, or other instrument to which the Employee is a party or by which the Employee may be bound; nor will any such action result in any violation of any provision of any applicable law, judgment, order, rule, or regulation of any court or governmental authority.

12.    <u>Governing Law.</u>    This Agreement shall be construed and enforced in accordance with, and shall be governed by, the laws of the State of Texas, without regard to its choice of law rules.

13.    <u>Entire Understanding.</u> This Agreement constitutes the entire understanding and agreement between the Company and the Employee with regard to all matters herein, and there are no other agreements, conditions, or representations, oral or written, expressed or implied, with regard thereto other than as referred to herein.   This Agreement may be amended only in writing, signed by both parties hereto.

14.    <u>Severability.</u>   If any term or provision of this Agreement shall be held to be invalid or unenforceable for any reason, such term or provision shall be ineffective only to the extent of such invalidity or unenforceability without invalidating the remaining terms and provisions hereof, and this Agreement shall be construed as if such invalid or unenforceable term or provision has not been contained herein.

6

Copy from re:SearchTX

15.  <u>Consent to Jurisdiction</u>.  The Employee agrees that any action or proceeding to enforce, or that arises out of, this Agreement may be commenced and maintained in the district courts of the United States.

16.  <u>Attorneys' Fees.</u>  In the event that this Agreement is breached by either party, the breaching party shall be liable for all costs and attorneys' fees incurred by the non-breaching party as a result of the breach or in enforcing the terms of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

"Company"

Genesis Coin, Inc. a Delaware C-Corp

By: _Evan Rose_
    D103DBA46C11433...
Evan Rose
Title: Founder
Date:

"Employee"

By: _Shawn Joseph_
    F560CC910556458...
Shawn Joseph
Title: Chief Intellectual Property Officer
Date:

Copy from re:SearchTX

Exhibit "A"
Bonus compensation, Equity and Profit Sharing

A variable bonus tied to company EBITDA will be paid annually as cash bonuses to all employees. An officer profit sharing plan, which could include equity and or additional cash equivalent incentives, will be memorialized in an amendment to this Agreement.

A performance-based compensation bonus will be issued to Employee at the discretion of Founder/President for any intellectual property issued to Company as a result of the CIPO's efforts while employed by the Company.

8

Copy from re:SearchTX

# EXHIBIT C

Copy from re:SearchTX

# GENESIS COIN, INC.

## RESTRICTED STOCK GRANT AGREEMENT

This Restricted Stock Grant Agreement (this "**Agreement**"), dated as of February 17, 2020, is made by and between Genesis Coin, Inc., a Delaware corporation (the "**Company**") and Shawn Joseph (the "**Recipient**"). All capitalized terms used herein without definition shall, unless otherwise indicated, have the meanings specified in the Genesis Coin, Inc. 2019 Restricted Stock Plan, as amended (the "**Plan**").

Grant of Restricted Stock. Concurrently with the execution and delivery of this Agreement, Company shall grant to the Recipient, and the Recipient shall receive from the Company, 1,000 Non-Voting Class B Common Restricted Stock of the Company (the "**Shares**"). The Shares shall have the rights specified in the Plan and shall be subject to all terms, conditions and restrictions set forth in the Plan and in this Agreement. The Board of Directors of the Company (the "**Board of Directors**") has determined that the Restricted Stock Threshold Value for each of the Shares is equal to $200. The Recipient acknowledges that, as a holder of the Shares, it will have the rights and privileges of a Shareholder who holds Non-Voting Restricted Stock pursuant to the terms and conditions set forth in the Plan.

Vesting Schedule, Termination and Repurchase.

For so long as the Recipient is providing services for the benefit of the Company or any of its Affiliates pursuant to that Employment Agreement by and between Genesis Services, Inc., a Delaware corporation, and the Recipient, dated on or near November 1, 2019 ("Start Date") (the "**Service Agreement**") and is in good standing on the relevant date, the Shares shall vest as follows: The Shares shall vest 100% on the third anniversary after the Start Date. Notwithstanding the previous sentence, on the sale of the Company, the Shares shall be vested in full.

Unless otherwise determined by the Board of Directors in their sole discretion, all unvested Shares held by the Recipient shall immediately and automatically be redeemed by the Company without any consideration therefor or any further action and shall no longer be treated as issued and outstanding if, (i) the Recipient ceases to provide services for the benefit of the Company or any of its Affiliates pursuant to the Service Agreement for any reason (except death, disability or retirement defined later in this subsection) or (ii) the Company terminates the Recipient's services with cause (each of (i) and (ii), a "**Termination Event**"). The Company may redeem vested Shares if employment terminates; provided, however under (i), if the service cessation occurs after the Recipient's completion of five years of continued service to the Company (the "Minimum Service Term") such redemption may occur only once an amount of time has elapsed since the service cessation equal to the duration of the Recipient's continued service to the Company between the completion of the Minimum Service Term and the service cessation date. The Company has no right to repurchase a Recipient's Restricted Shares if the

LIBC/4757393.4

Copy from re:SearchTX

Termination event results from the Recipient's death, "permanent and total disability" as defined in Section 22(e)(3) of the Internal Revenue Code of 1986, as amended, or retirement from the Company on or after the Recipient's age plus years of service to the Company equals or exceeds 65 years. In order to retain such Restricted Shares after termination of service, the Recipient must inform the Company Secretary his or her address and telephone number at least once per year and whenever he or she moves to a new address or obtains a new telephone number.

The Recipient hereby appoints the Secretary of the Company with full power of substitution, as the Recipient's true and lawful attorney-in-fact with irrevocable power and authority in the name and on behalf of the Recipient to take any action and execute all documents and instruments, including, without limitation, stock powers which may be necessary to transfer the certificate or certificates evidencing such forfeited or repurchased Shares to the Company and cancel the Shares on the books of the Company upon the occurrence of a Termination Event, or, in the case of a repurchase of the Shares, upon the Company's delivery of the Purchase Price to the Recipient.

Notwithstanding the above provisions, the Company may elect to redeem any vested Restricted Shares before Company sale, and except in cases where the Recipient died, was disabled, or retired as specified above, after a Recipient is no longer providing services to the Company at any time for $25 per Share, upon due notice to Recipient or his or her successors.

Tax Consequences. At his or her sole determination, the Recipient may timely file a properly completed election, substantially in the form attached hereto as Exhibit A (the "**Election**"), under Section 83(b) of the Internal Revenue Code of 1986, as amended, with respect to the Shares and otherwise comply with all requirements of Regulation Section 1.832. The Recipient acknowledges that the Recipient has reviewed with the Recipient's own tax advisors the tax consequences of this Agreement, the grant and its surrounding circumstances, the terms and structure of the Recipient's ownership of the Shares and the Recipient's Election, and is relying solely on such advisors and not on any statements or representations of the Company or any of its agents. The Recipient understands that the Recipient (and not the Company) shall be responsible for the Recipient's own tax liability that may arise as result of the transactions contemplated by this Agreement or relating in any manner to the Shares.

Notices. All notices, requests, consents and other communications shall be in writing and be deemed given when delivered personally, by facsimile or electronic mail transmission or when received if mailed by first class registered or certified mail, postage prepaid. Notices to the Company or the Recipient shall be addressed as set forth underneath their signatures below, or to such other address or addresses as may have been furnished by such party in writing to the other.

Entire Agreement; Counterparts. This Agreement, the Plan, and the Service Agreement contain the entire understanding between the parties concerning the subject matter contained in this Agreement. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties hereto, relating to the subject matter of this Agreement,

2

Copy from re:SearchTX

that are not fully expressed herein. This Agreement may be signed in one or more counterparts, all of which shall be considered one and the same agreement.

Further Assurances. Each party to this Agreement agrees to perform all further acts and to execute and deliver all further documents as may be reasonably necessary to carry out the intent of this Agreement.

Severability. In the event that any one or more of the provisions contained in this Agreement should be determined to be invalid, illegal or unenforceable in any respect, the same shall be construed and, if necessary, reformed in substance, by limiting it so as to be valid and enforceable to the maximum extent permitted by applicable law, and the validity, legality and enforceability of the remaining provisions shall not be affected or impaired and shall remain in full force and effect to the fullest extent permitted by law.

Construction. Whenever used in this Agreement, the singular number will include the plural, and the plural number will include the singular, and the masculine or neuter gender shall include the masculine, feminine or neuter gender. The headings of the Sections of this Agreement have been inserted for purposes of convenience and shall not be used for interpretive purposes.

Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of laws principles of such state.

Successors. The rights and obligations of the Company under this Agreement shall be transferable to any successor to all or substantially all of its business. The rights and obligations of the Recipient under this Agreement may only be assigned with the prior written consent of the Company.

Amendment. This Agreement may only be amended by the written consent of the parties to this Agreement at the time of such amendment.

No Waiver. Either party's failure to enforce any of the provisions of this Agreement shall not in any way be construed as a waiver of any such provision, nor prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are cumulative and shall not constitute a waiver of either party's right to assert any other available legal remedy.

No Right to Continued Employment or Service. Nothing contained in this Agreement shall be construed under any circumstances to bind the Company or any of its Affiliates to continue to employ, or retain the services of, the Recipient for any period.

Adequate Review. The Recipient has consulted such legal, financial, technical or other experts or advisors as he deems necessary or desirable before entering into this Agreement. The Recipient represents and warrants that the Recipient has read, understands and agrees with the terms and conditions of this Agreement. The Recipient has not relied upon any oral or written

3

Copy from re:SearchTX

representation of the Company or any of the Company's Affiliates in entering into this Agreement. The Recipient acknowledges the risks of the Recipient's undertakings under this Agreement and its assumption of such risks and uncertainty.

[*The remainder of this page has been left blank intentionally.*]

4

Copy from re:SearchTX

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date first above written.

**COMPANY**:

GENESIS COIN, INC.

By: _____

     Name:  Evan Rose
     Title:  Founder & CEO


**RECIPIENT**:

_____  2/14/20

Name: Shawn Joseph


[Signature Page to Restricted Stock Grant Agreement]

## **EXHIBIT A**

(Attached)

Copy from re:SearchTX

Election to Include in Gross Income
in Year of Transfer of Property
Pursuant to Section 83(b) of the Internal Revenue Code

The undersigned hereby makes an election pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended, with respect to the property described below and supplies the following information in accordance with the regulations promulgated thereunder:

1.     The name, address and taxpayer identification number of the undersigned are:

Shawn Joseph (the "**Taxpayer**")

Social Security No./Tax ID No.:

2.     Description of property with respect to which the election is being made:

The election is being made with respect to 1,000 Nonvoting Class B Common Restricted Stock (the "**Shares**") in Genesis Coin, Inc. (the "**Company**").

3.     The date on which the Shares were transferred is February 17, 2020. The taxable year to which this election relates is calendar year 2020.

4.     Nature of restrictions to which the Shares are subject:

The Shares are subject to a vesting schedule. Unvested Shares are forfeited if the Taxpayer ceases to provide services to the Company or its affiliates. Vested Shares may be repurchased by the Company at fair market value if the Taxpayer ceases to provide services to the Company or its affiliates. The Shares are also subject to certain restrictions on transfer.

5.     The fair market value at time of transfer (determined without regard to any restrictions other than restrictions that by their terms will never lapse) for each of the Shares with respect to which this election is being made was $200.

6.     The amount paid by the Taxpayer for the Stock was $0.

7.     A copy of this statement has been furnished to the Company and to all other persons entitled to receive a copy of this statement as provided in Treasury Regulations §1.83-2(d).

Date:

2/14/20

Name:

Copy from re:SearchTX